IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ELIA MOORE,                        §
                                   §
                    Plaintiff,     §
                                   §   Civil Action No. 3:07-CV-0009-D
VS.                                §
                                   §
DALLAS INDEPENDENT SCHOOL          §
DISTRICT,                          §
                                   §
                    Defendant.     §

MEMORANDUM OPINION
AND ORDER

The instant motion for partial judgment on the pleadings
presents the question whether a school teacher has adequately
pleaded a state-created danger claim arising from injuries she
sustained when another teacher attempted to break up a fight
between two middle school students. Concluding that she has not,
the court dismisses this claim for relief, which is asserted in her
complaint and in her proposed first amended complaint.

I

Since 1995 defendant Dallas Independent School District
("DISD") has been aware of the problem of student violence in its
schools.[1] Yet the DISD Board of Trustees ("Board") has never

---

[1]"The standard for deciding a [Fed. R. Civ. P. 12(c)] motion
is the same as a Rule 12(b)(6) motion to dismiss." *Guidry v. Am.
Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). Thus for
purposes of deciding DISD's motion for partial judgment on the
pleadings, "[t]he 'court accepts all well-pleaded facts as true,
viewing them in the light most favorable to the plaintiff.'" *In re
Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)
(internal quotations omitted) (quoting *Martin K. Eby Constr. Co. v.
Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

forbidden teachers from trying to intervene in these fights to break them up. Consequently, DISD teachers and staff often take matters into their own hands and attempt to break up student fights. Other teachers and staff, however, decide to stay away from the fights. The Board has been aware for many years that, in practice, teachers and support staff attempt to break up fights and that they and others have been injured in the process. The Board has never acted to stop this practice. Despite the Board's knowledge of injuries to DISD teachers and staff, the Board has made a policy choice not to train DISD teachers and staff on how to deal with student violence. The Board has not enacted any policy specifically directed at protecting DISD teachers and staff. DISD teachers do not carry walkie talkies or radios, which would enable them to call for assistance when a fight breaks out.

The Board is required under both federal and state law to report incidence of student violence. But as student fights have become much more frequent in recent years within the school district, the Board has under-reported the acts of violence of which it was aware because it feared losing public funding. Attempting to keep the number of reported acts of student violence down, the Board has discouraged teachers from reporting student violence.

In 2005 plaintiff Elia Moore ("Moore") was a full-time math teacher at Marsh Middle School, a school within DISD. One of

Moore's duties as a classroom teacher was to monitor students as they moved through the school hallways between classes. In 2005, as Moore was monitoring students in the hallway, a fight broke out near her between two eighth grade boys. Another teacher, Marvin Lane ("Lane"), rushed toward the boys and attempted to separate them. He was unable to do so, and his unsuccessful efforts caused him to lose his balance and start to fall. Moore attempted to keep her distance from the fight, but as Lane fell to the floor he kicked Moore's feet out from under her, causing her to fall hard on her knees. Once on the floor, the force of the three falling bodies shoved Moore up against the wall, injuring her neck and shoulders.

Moore later filed this lawsuit under 42 U.S.C. § 1983 against DISD, alleging violations of her Fourteenth Amendment right to due process. Among her three constitutional claims, Moore asserts that the failure of the Board to curb the growing problem of student violence, and its failure to supervise and train teachers on how to respond to student violence, have deprived her of her substantive due process right to her bodily integrity. Moore contends that the Board's failure to implement a policy of teacher safety, and its failure to train teachers on how to deal with student fights, were the moving forces behind her injuries and demonstrate that the Board—which was aware for several years that teachers had been injured in attempts to break up student fights—was deliberately

indifferent to the health and safety of DISD teachers, such as Moore.

DISD moves for partial judgment on the pleadings under Fed. R. Civ. P. 12(c), seeking dismissal of Moore's claim that DISD deprived her of her substantive due process right to bodily integrity. DISD contends that Moore has failed to state a cognizable constitutional claim for the deprivation of her right to bodily integrity. DISD argues that, if Moore's substantive due process claim is based on DISD's failure to provide a safe work environment, the suit fails to state a claim because DISD had no constitutional duty to provide a safe working environment. It posits that, if Moore intends to base her claim on the state-created danger theory, her complaint fails to adequately plead this cause of action.

Before she responded to DISD's motion, Moore sought leave to amend her complaint. Her proposed first amended complaint attempts to clarify the ambiguity in her complaint concerning the basis for her entitlement to relief for the deprivation of her substantive due process right to bodily integrity. The proposed first amended complaint unequivocally grounds Moore's right to recovery on the state-created danger theory. The proposed first amended complaint also supplements the factual basis for Moore's state-created danger claim.

In responding to DISD's motion for partial judgment on the

pleadings, Moore urges the court not to decide the motion until it rules on her motion for leave to amend. DISD opposes Moore's motion for leave to amend, contending that granting such leave would be futile because the first amended complaint is subject to the same defects that the motion for partial judgment on the pleadings identifies concerning the complaint. In its reply in support of its motion for partial judgment on the pleadings, DISD makes numerous references to the first amended complaint, arguing that the first amended complaint is subject to dismissal on the same basis.

                                    II

        The court first addresses Moore's motion for leave to amend the original complaint.

        Because Moore's November 13, 2007 motion for leave to amend was filed before the December 10, 2007 deadline for filing such motions, Fed. R. Civ. P. 15(a) controls the granting of plaintiff's request for leave to amend. *See S & W Enters., L.L.C. v. Southtrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003). Under Rule 15(a)(2), "[t]he court should freely give leave when justice so requires."

> In the absence of any apparent or declared reason——such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.——the leave sought should, as the rules

require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

DISD opposes Moore's motion solely on the basis that granting leave to amend would be futile, because Moore's state-created danger claim in the first amended complaint is subject to dismissal in that it fails to adequately plead this cause of action. Denying Moore's motion for leave to amend because it is subject to dismissal is within the court's discretion. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007) (affirming denial of motion to amend complaint under Rule 15(a) because proposed amendment would be subject to same grounds of dismissal as contained in defendants' original Rule 12(b)(6) motion); *Stripling v. Jordan Prod. Co.,* 234 F.3d 863, 873 (5th Cir. 2000) ("While this court has not specifically defined 'futility' in [the Rule 15(a)] context, we join our sister circuits that have interpreted it to mean that the amended complaint would fail to state a claim upon which relief can be granted."); *DeLoach v. Woodley*, 405 F.2d 496, 497 (5th Cir. 1968) (per curiam) ("Where a complaint, as amended, would be subject to dismissal, leave to amend [under Rule 15(a)] need not be granted."). But the court cannot determine whether Moore's proposed first amended complaint is subject to dismissal without engaging in a detailed analysis of the proposed pleading in relation to cases that interpret the state-created danger theory. "If a proposed amendment is not

*clearly* futile, then denial of leave to amend is improper." 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1487, at 637, 642 (2d ed. 1990) (emphasis added). Because Moore's proposed first amended complaint is not clearly futile, the court will not deny Moore's motion for leave to amend on the basis of futility.

Because futility of amendment is DISD's sole ground in opposing Moore's motion, the court discerns no compelling reason to deny granting leave under the liberal standard of Rule 15(a)(2). *See, e.g., Siesta Village Market, LLC v. Perry*, ___ F.Supp.2d ___, 2008 WL 123905, at *9 (N.D. Tex. Jan. 14, 2008) (Fitzwater, C.J.), *appeals docketed*, Nos. 08-10145 (5th Cir. Feb. 18, 2008), 08-10146 (5th Cir. Feb. 19, 2008), 08-10148 (5th Cir. Feb. 19, 2008), and 08-10160 (5th Cir. Feb. 21, 2008). Accordingly, the court grants Moore's November 13, 2007 motion for leave to amend, and her proposed first amended complaint is deemed the operative pleading for purposes of deciding DISD's Rule 12(c) motion.

III

Granting Moore's motion for leave to amend does not, however, end the court's analysis of the sufficiency of the first amended complaint. DISD's motion for partial judgment on the pleadings predates plaintiff's motion for leave to file the amended complaint, which supersedes the complaint to which DISD's motion for judgment on the pleadings was directed. "[T]he court may

nevertheless treat defendant['s] motion as directed to the amended complaint because the defects in [plaintiff's] complaint reappear in the amended complaint." *Holmes v. Nat'l Football League*, 939 F. Supp. 517, 523 n.7 (N.D. Tex. 1996) (Fitzwater, J.); *see also Patton Elec. Co. v. Rampart Air, Inc.*, 777 F. Supp. 704, 713 (N.D. Ind. 1991) ("'If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.'") (quoting 6 Charles A. Wright, et al., *Federal Practice and Procedure* § 1476, at 556-58 (2d ed. 1990)).  Because DISD asserts that the first amended complaint is subject to dismissal on the same grounds as is the complaint, and the parties have fully briefed the sufficiency of the first amended complaint's state-created danger claim, the court will consider DISD's arguments in its motion for partial judgment on the pleadings in assessing whether the first amended complaint states a claim on which relief can be granted.

IV

A

"The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss." *Guidry v. Am. Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).  In deciding defendant's motion, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)

(internal quotations omitted) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007)). "'Factual allegations must be enough to raise a right to relief above the speculative level[.]'" *Id.* (quoting *Bell Atl.*, 127 S. Ct. at 1965). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl.*, 127 S. Ct. at 1964-65 (citations, quotation marks, and brackets omitted).

                                   B

    "To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994). Only the first prong is at issue in deciding DISD's motion for partial judgment on the pleadings. "With respect to the DISD, a local governmental unit under *Monell v. Department of Social Servs.*, 436 U.S. 658 (1978), [Moore] must also allege that an 'official policy

of custom' of the DISD was a cause in fact of the deprivation of rights inflicted." *Id.* (citation partially omitted) (quoting *Monell*, 436 U.S. at 690-91). "Local governmental units may not be held liable under § 1983 under a theory of *respondeat superior*." *Id.* (citing *Monell*, 436 U.S. at 691).

1

The Fourteenth Amendment Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Supreme Court has long recognized that the Due Process Clause is more than a guarantee of procedural fairness and 'cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Breen v. Tex. A&M Univ.*, 485 F.3d 325, 332 (5th Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)) (internal quotation marks omitted). "The reach of substantive due process is limited, however, and it protects against only the most serious of governmental wrongs." *Id.* "The Court has emphasized that 'because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended,' courts should be 'reluctant to expand the concept of substantive due process.'" *Id.* at 332-33 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

"When a plaintiff complains of abusive executive action,

substantive due process is violated 'only when [the conduct] can properly be characterized as arbitrary, or conscience shocking in a constitutional sense.'" *Id.* at 333 (quoting *County of Sacramento*, 523 U.S. at 847) (quotation marks omitted). "Negligent acts, for example, are insufficient to trigger a substantive due process violation." *Id.* (citing *County of Sacramento*, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.")).

"While it is clear that individuals have a substantive due process right to be free from state-occasioned bodily harm, it is equally clear that the Constitution does not, as a general matter, impose upon state officials a duty of care to protect individuals from any and all private harms." *Id.* (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196-97 (1989) ("As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.")).

The Fifth Circuit has recognized two possible exceptions to this general rule rooted in the language of *DeShaney*. *Id.* First, under the "special relationship" exception, "the Constitution imposes upon the state a duty of care towards individuals who are in the custody of the state." *Id.* (citing *DeShaney*, 489 U.S. at 199-200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it

a corresponding duty to assume some responsibility for his safety and general well-being."); *see also Leffall*, 28 F.3d at 526. Moore does not invoke the "special relationship" exception, nor could she, because she is a voluntary employee of DISD. *See de Jesus Benavides v. Santos*, 883 F.2d 385, 388 (5th Cir. 1989) (holding that special relationship exception does not apply to state employees who "enlisted, on terms they found satisfactory, and [who] were free to quit whenever they pleased." (internal quotation marks omitted)); *see also Leffall*, 28 F.3d at 526-28.

Second, "some language from *DeShaney* has been read to suggest that state officials also have a duty to protect individuals from harm when their actions created or exacerbated a danger to the individual." *Breen*, 485 F.3d at 333 (citing *DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that [plaintiff] faced in the world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.")). "This latter exception mentioned in *DeShaney* is often recognized as the primary source for what has been termed the state created danger theory." *Id.* Prior to *Scanlan v. Texas A&M University*, 343 F.3d 533 (5th Cir. 2003), the Fifth Circuit had not adopted the state-created danger theory, and had "often expressed reluctance to embrace the state-created danger theory, while noting its adoption in other courts." *Breen*, 485 F.3d at 333-34. It is upon this latter theory that Moore expressly bases her § 1983 claim

for the deprivation of her liberty interest in her bodily integrity.

"[T]o recover on a state-created danger claim, the plaintiff must show that the harm to the plaintiff resulted because (1) the defendant's actions created or increased the danger to the plaintiff, and (2) the defendant acted with deliberate indifference toward the plaintiff." *Id.* at 334-35. The claim also requires "an identifiable victim." *Id.* at 335.

2

The court must address one preliminary difficulty with Moore's state-created danger claim: that Lane, a fellow teacher and state actor, contributed to Moore's physical injuries. Although Moore does not assert a constitutional violation against Lane, the state-created danger theory requires that the injury be caused by a third party. *See Kinzie v. Dallas County Hosp. Dist.*, 106 Fed. Appx. 192, 195 (5th Cir. 2003) (per curiam) (affirming dismissal of state-created danger claim for failure to state a claim upon which relief can be granted, because plaintiff "did not allege that he was harmed by a third party" but rather a state actor). But because the two eighth graders, who were third parties, also contributed to Moore's injuries, the court concludes that Lane's involvement in causing Moore's physical injuries is not fatal to her state-created danger claim.

V

The court examines initially whether Moore has adequately pleaded the first element of the state-created danger theory, i.e., that DISD's actions created or increased the danger that Moore faced of being injured by student fights.

A

The court begins its analysis by examining *DeShaney*, because it illustrates a scenario in which the first element of a state-created danger theory was missing.   In *DeShaney* the plaintiff, a four-year-old, brought a § 1983 claim against the Winnebago County Department of Social Services ("DSS") for violating his substantive due process rights after he was severely beaten by his father. *DeShaney*, 489 U.S. at 193.   DSS first learned that the plaintiff's father might be abusing the boy when the father's second wife complained to the police.   *Id.* at 192.   Later, when the boy went to the hospital with suspicious bruises and sores, the treating physician notified DSS that the boy's injuries were likely the result of abuse.   *Id.*   DSS concluded that there was not enough evidence of child abuse to retain custody of the boy, but recommended some protective measures to the father, and the father agreed to these conditions.   *Id.*   A month later, the boy went to the emergency room again with suspicious injuries, and DSS caseworkers were notified, but again they concluded there was not enough evidence to take action.   *Id.*   For the next six months, a

DSS caseworker made monthly visits to the boy's home, and she often observed suspicious injuries on the boy's head. *Id.* at 192-93. But DSS did not take any action. Soon after, emergency room doctors once again notified DSS that the boy had been treated for injuries that they believed to be caused by child abuse. *Id.* at 193. Still DSS did not take any steps to protect the boy. *Id.* A few months later, the father beat the boy to the point of causing him to fall into a life threatening coma. The boy was expected to spend the rest of his life in an institution for the profoundly retarded. *Id.*

Although the *DeShaney* Court noted the genuine tragedy of the plaintiff's injuries, it concluded that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. "Its purpose was to protect people from the State, not to ensure that the State protected them from each other." *Id.* at 196. Although the Court laid out in dicta the language from which circuit courts later implied the state-created danger theory as an exception to the general rule that the state's failure to protect individuals from private violence does not constitute a due process violation, *id.* at 201, the Court did not believe the exception applied in the case before it. Despite the fact that DSS had played an active role in trying to monitor the boy's health, and received numerous warnings that the boy was being

abused by his father, the Court held that DSS did not create the dangers that the boy faced: "The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id.* at 203.

A number of circuit courts, including the Fifth Circuit, have dismissed state-created danger claims when it appeared from the plaintiff's complaint that the relevant state actors did not create the danger by some affirmative act, or the plaintiff's evidence could not support such a finding.

In *Salas v. Carpenter*, 980 F.2d 299 (5th Cir. 1992), the plaintiffs filed suit on behalf of a woman who died after an unsuccessful attempt to free her when she was taken hostage by her ex-husband. They sued Sheriff Don Carpenter ("Sheriff Carpenter"), who directed the hostage rescue efforts. *Id.* at 301-02. When the woman's ex-husband took her hostage in the office building where she worked, the county Sheriff's department and the city police were both called to the location. *Id.* at 302. The city police dispatched well-equipped SWAT and hostage negotiation teams to the scene and prepared to begin negotiations with the ex-husband and set up sniper positions around the office building. *Id.* But Sheriff Carpenter refused to accept their assistance and demanded that the city police depart the premises, because it was Sheriff Carpenter's opinion that the building was under the exclusive

jurisdiction of the Sheriff's department. *Id.* The Sheriff's department did not have a SWAT team, and it also lacked personnel with hostage negotiation experience. *Id.* Sheriff Carpenter spoke briefly on the telephone with the assailant, who quickly hung up on him. *Id.* Later in the day, a leading hostage negotiation authority offered his services to Sheriff Carpenter, but his help was not accepted. *Id.* Sheriff Carpenter never contacted the hostage's family to discover more about the assailant.[2] *Id.* at 303. Hours later, the ex-husband became unresponsive. Later that evening, the hostage expressed a desire to talk to her children on the telephone. *Id.* Although the Sheriff's department took these as warning signs, it did not have SWAT weapons and training to execute a dynamic entry into the office building. *Id.* Within one hour of the hostage's request, the assailant shot and killed the hostage and himself. *Id.*

The plaintiffs premised their state-created danger claim on many of Sheriff Carpenter's poor decisions——in particular his decision to dismiss the city police, who were well equipped to free the hostage——and his mishaps in attempting to negotiate with the ex-husband, as well as his failure to adequately train and equip his department for a hostage situation. *Id.*

Without adopting the state-created danger theory, the court

---

[2]The hostage had earlier complained to the District Attorney that her ex-husband was sexually molesting her two daughters. *Salas*, 980 F.2d at 302.

- 17 -

held that the plaintiffs could not establish the first element, i.e., that the state created the dangers that the victim faced. "Courts have found a denial of due process when the state creates the faced dangers . . . [but] [p]laintiffs must urge an expansion of this rule, for no reasonable jury could find that Carpenter created the danger that [the assailant] would kill [the hostage]." *Id.* at 309. The court acknowledged that the state-created danger theory might also apply when the state takes an affirmative action that increases the individual's vulnerability to such dangers. *Id.* Yet it also concluded, "[w]e are not persuaded, however, that Carpenter increased [the victim's] vulnerability to danger in the sense envisioned by the Court in *DeShaney*." *Id.* "The sheriff continued at all times to supervise a law enforcement effort to secure her safe release. We decline to hold that this conduct shocks the conscience or is otherwise a deprivation of due process." *Id.*

In *Johnson v. Dallas Independent School District*, 38 F.3d 198 (5th Cir. 1994), the father of a boy who was shot and killed at school brought a § 1983 claim against DISD and the school principal. *Id.* at 199. On the day of the shooting, the assailant, a boy who was not a student at the victim's school, rode one of the school's buses to get to the school, entered the high school building carrying a concealed handgun, and, after creating a disturbance, began to shoot. The victim happened to be in the line

of fire and was killed. *Id.* Although the victim's high school had metal detectors, which could have prevented the assailant from entering with the firearm, they were not being used at the time. *Id.* at 204 (Goldberg, J., dissenting). The school also required students to purchase school identification badges, but on the day of the shooting, there was no one to check that persons entering the premises had them. *Id.* Addressing the adequacy of plaintiff's state-created danger claim, the court began by noting that "[t]he key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* at 201 (quotation marks omitted). The court held that the plaintiff's complaint failed to allege that the school created the dangers faced by the victim.

> There is no pleading that school officials placed [the boy] in a dangerous environment stripped of means to defend himself and cut off from sources of aid. There is no sufficiently culpable affirmative conduct. [The boy] went to school. No state actor placed [the boy] in a unique, confrontational encounter with a violent criminal. No official in the performance of her duties abandoned him in a crack house or released a known criminal in front of his locker. There is no suggestion that the school district or principal fostered or tolerated anarchy at [the high school].

*Id.* at 202 (citations and quotation marks omitted). Thus the court affirmed the dismissal of the claim on Rule 12(b)(6) grounds. *Id.*

at 204.

Similarly, in *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992) (en banc), the *en banc* Third Circuit affirmed the dismissal under Rule 12(b)(6) of state-created danger claims when the complaint failed to establish that the conduct of the state actors created the dangers faced by the victim. The plaintiffs were two female students who were physically, verbally, and sexually molested by a few boys in the same graphics art class that plaintiffs attended. *Id.* at 1366. The conduct took place primarily in a unisex bathroom and a darkroom, which were part of the graphic arts classroom. *Id.* One of the plaintiffs informed an assistant director of the school about the abuse, but the school took no action. *Id.* The plaintiffs also alleged that several other school officials had knowledge of the non-sexual misconduct occurring in the classroom. *Id.* The plaintiffs sued the school and various school officials under § 1983 for deprivation of their liberty interest in their bodily integrity. They contended that the defendants had (1) failed to report to the plaintiffs' parents or other authorities about the abuse taking place; (2) placed the class under the control of an inadequately trained student teacher; (3) failed to demand proper conduct of the student abusers; and (4) failed to investigate and stop the physical and sexual misconduct. *Id.* at 1368, 1373. The court held that the plaintiffs had failed to state

a valid state-created danger claim, because, among other reasons, the creation of the danger could not be attributed to the state actors. *Id.* at 1373-77.

The *en banc* court held that the state-created danger theory requires that "the state actors involved affirmatively acted to *create* plaintiff's danger, or to render him or her more *vulnerable* to it." *Id.* at 1373. "Liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." *Id.* at 1374. The court concluded that "we are convinced that the school defendants did not create plaintiffs' peril, increase their risks of harm, or act to render them more vulnerable to the student defendants' assaults." *Id.*

> We readily acknowledge the apparent indefensible passivity of at least some school defendants under the circumstances. Accepting the allegations as true, viz., that one school defendant was advised of the misconduct and apparently did not investigate, they show nonfeasance but they do not rise to the level of a constitutional violation. As in *DeShaney*, "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them."

*Id.* at 1376 (quoting *DeShaney*, 489 U.S. at 203).

The Fourth Circuit reached the same conclusion in *Stevenson v. Martin County Board of Education*, 3 Fed. Appx. 25 (4th Cir. 2001) (per curiam), where the plaintiff alleged that the school and

several school officials "violated his liberty interest in bodily integrity . . . when they allowed his classmates to physically assault him at school over a period of several weeks." *Id.* at 27. At the beginning of his sixth-grade year, the plaintiff was robbed and assaulted in the lunch yard by two boys, Charles McEachern ("McEachern") and Kemadrick Sherrod ("Sherrod"). *Id.* A few days later, Sherrod threw books at the plaintiff and was later suspended for doing so. *Id.* In retaliation for the suspension, McEachern picked a fight with the plaintiff, and the school suspended McEachern. *Id.* The plaintiff's father complained to the school principal that McEachern was threatening his son, and he requested that his son be put in separate classes. *Id.* Although the principal assured the father that this would be done, it was not. *Id.* McEachern continued to harass and intimidate the plaintiff, and the plaintiff's father complained again to the principal and also to the school counselor. *Id.* at 27-28. One day in class, McEachern falsely accused the plaintiff of breaking his glasses. When the plaintiff denied it, McEachern began to punch the plaintiff in the head. *Id.* at 28. The plaintiff's teacher told him that there was nothing she could do and that he probably deserved the beating. *Id*. As the plaintiff left for the principal's office to get help, McEachern and a friend chased him down the hallway. *Id.* The boys knocked the plaintiff to the floor and, for about ten minutes, proceeded to punch and kick him all

over his body. *Id.* McEachern and his friend were suspended, and they later admitted to assault charges in juvenile court. *Id.* While the juvenile proceedings were pending, three of McEachern's friends threatened the plaintiff, who immediately reported the threats to the principal. *Id.* But this did not prevent the boys from assaulting the plaintiff later that day. *Id.* After further harassment, the plaintiff's family decided to transfer the plaintiff to a private school because he had already suffered serious physical and emotional problems after repeated assaults and harassment at school. *Id.*

Analyzing the plaintiff's complaint under the state-created danger rubric, the court reasoned: "In order to create a danger, the state has to take some affirmative steps. Liability does not arise when the state stands by and does nothing in the face of dangers. Failing to provide protection from danger does not implicate the state in the harm caused by third parties." *Id.* at 31 (citing *DeShaney*, 489 U.S. at 203) (citations omitted).

> [W]e have to conclude in this case that the school officials did not create the danger that [the plaintiff] faced at the hands of his classmates. In fact, the school did more than just stand by while [the plaintiff] was being brutalized. The school took some measures to remedy the situation . . . . The school surely could have done more to protect [the plaintiff], given the frequent and brutal attacks by McEachern and others. But the failure to protect by itself is not sufficient to trigger constitutional liability in this situation.

*Id.* at 32.   The court therefore affirmed the dismissal of the state-created danger claim under Rule 12(b)(6).   *Id.* at 35.

A review of the foregoing cases persuades the court that Moore's first amended complaint fails to plead facts that establish the first element of the state-created danger theory, i.e., that DISD through affirmative acts created or rendered Moore more vulnerable to the danger of being injured by student fights.   DISD did not create the danger that student fights posed to DISD teachers.   As in *Middle Bucks*, Moore's theory of recovery sounds almost entirely in nonfeasance: DISD failed to curb student violence; it failed to train its teachers on how to respond to student fights; it failed to enact a policy specifically aimed at protecting teachers from student fights; and it failed to give its teachers walkie talkies or radios, etcetera.

To be sure, it is a sorry state of affairs when professionals who are educated and trained to teach and nurture young people are subjected to physical abuse and acts of violence on school premises.   But the cases discussed above, including *DeShaney*, establish that the state-created danger theory simply is not implicated by the failure of state actors to protect individuals from known and serious risks of harm.   The core of Moore's state-created danger claim is that the DISD board "has sat by passively and done nothing to eliminate or reduce the danger to teachers"

posed by student violence.  1st Am. Compl. § IX, ¶ 3 (bold font omitted).  Such conduct fails to establish the first element of a state-created danger claim.  *DeShaney*, 489 U.S. at 203 ("The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.").

Moore argues that her complaint alleges affirmative acts by DISD that exacerbated the risk to DISD teachers of being injured by student fights.  For instance, Moore avers that, for the past few years, DISD has under-reported occurrences of student violence and has also discouraged teachers from reporting instances of student violence.  But Moore does not allege how these actions by DISD increased the risks to its teachers of being injured by student fights.  The first amended complaint alleges that DISD under-reported incidents of student violence so as not to lose school funding from the state and federal government.  Moore does not elaborate on how DISD teachers would face a reduced risk of harm of being injured by a student fight if DISD were to accurately report incidents of student violence.

Assuming *arguendo* that under-reporting student violence and discouraging teachers from reporting student violence increased the risk of harm that student fights posed to DISD teachers, the court is "not persuaded, however, that [these affirmative actions] increased [Moore's] vulnerability to danger in the sense envisioned

by the Court in *DeShaney*." *Salas*, 980 F.2d at 309. In *Salas* the court held that various affirmative acts of Sheriff Carpenter——ordering that the city police with its SWAT and hostage negotiation teams depart the premises, botching the negotiations with the assailant, and refusing the help of a local negotiations expert——perhaps increased the risk of harm to the victim, but not enough to present a viable state-created danger claim. *See id.* at 309. Failing to report accurate student violence statistics and discouraging teachers from reporting student violence could not have increased the risk of harm to Moore any more than Sheriff Carpenter's affirmative acts increased the risk of harm to the hostage victim in *Salas*. At most, were the actual frequency of student violence a matter of public knowledge, the DISD Board might feel pressured to act more comprehensively to protect classroom teachers. In this sense, the affirmative acts of under-reporting and of discouraging teachers from reporting student violence represent no more than conduct that, if halted, might lead DISD to take other steps to protect teachers from known and serious risks of harm, not affirmative steps that created or exacerbated the danger that teachers face from students who fight.

"The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off

potential sources of private aid." *Johnson*, 38 F.3d at 201 (quotation marks omitted). The *Johnson* panel's conclusion that such affirmative conduct was lacking when a student was killed by an act of violence inside the school, even though the school could have prevented the death through ordinary safety measures, compels the same conclusion in this case, where Moore was injured by an act of student violence within the school where she taught.

Moore attempts to draw parallels between DISD's response to student violence and Texas A&M University's response to the growing danger of its annual bonfire that ultimately killed twelve students. *See Scanlan*, 343 F.3d at 535, 538. In *Scanlan* the Fifth Circuit for the first time explicitly recognized the state-created danger theory as a cognizable claim. *See Breen,* 485 F.3d at 335-36. As far as this court is aware, of the many Rule 12(b)(6) dismissals of state-created danger claims to reach the Fifth Circuit, *Scanlan* is the only panel to reverse. *Scanlan*, 343 F.3d at 540. With respect to the first element of a state-created danger claim——that some affirmative act of the state must have created or increased the risk of harm to the plaintiff——the plaintiffs' state-created danger claim in *Scanlan* is fundamentally different from Moore's. In *Scanlan* the threat of danger to the plaintiffs——the large bonfire built by inexperienced students——was an official university activity and, as the plaintiffs alleged in their complaint, the university "actively encouraged and enticed

students and alumni to work on the Bonfire stack[.]" *Id.* at 538 (internal quotation marks omitted); *see also Breen*, 485 F.3d at 332 (calling annual construction of bonfire stack "a recognized and sanctioned University activity"). Conversely, the threat of danger that Moore faced——the risk of being injured by student violence——was not created or exacerbated by an official activity of DISD. As Moore's first amended complaint acknowledges, DISD has not endorsed student violence but rather has taken steps, albeit unsuccessful ones, to reduce student violence within DISD. In the most general sense, DISD's affirmative act of operating public schools created the opportunity for student violence within DISD. But such a general connection between the risk of harm and the state's affirmative act would undermine the holdings of *Johnson*, *Middle Bucks*, and *Stevenson* and, if allowed to satisfy the first prong of a state-created danger claim, would unduly expand this constitutional claim, which was intended to be an exception to the general rule that state actors are not constitutionally responsible for injuries inflicted by private acts of violence.

Moore also relies heavily on *Lopez v. Houston Independent School District*, 817 F.2d 351 (5th Cir. 1987). In *Lopez* the plaintiff, as next friend of a student who was severely beaten by other classmates on a school bus, sued the school district under § 1983 for the deprivation of the student's substantive due process liberty interest. *Id.* at 352. The plaintiff alleged that the

school district's failure to provide adequate safety instruction to its bus drivers on how to deal with student violence caused his injuries and demonstrated a callous disregard for the students' liberty interests, because the school district was aware of pervasive student violence on its school buses. *Id.* at 354. The *Lopez* panel affirmed a summary judgment in favor of the school district, concluding that the plaintiff had not submitted sufficient evidence that the problem of student violence on school buses was pervasive, suggesting that the legal theory of plaintiff's claim was legitimate. *Id.* at 354-55. Moore's substantive due process claim against DISD for her physical injuries is almost identical to that of the plaintiff in *Lopez*. But *Lopez* predates the Supreme Court's *DeShaney* decision, which changed the landscape of substantive due process claims for injuries sustained by private acts of violence. *See Leffall*, 28 F.3d at 527 (expressing doubt that *Lopez* survives *DeShaney*). Just recently, the Fifth Circuit has explained that, in the wake of *DeShaney*, there are only two exceptions to the general rule that state officials have no constitutional duty to protect individuals from any and all private harms: the special relationship exception and the state-created danger exception. *Breen*, 485 F.3d at 333. As explained above, Moore has failed to plead facts that establish a claim under either exception.

For the foregoing reasons the court holds that Moore has

failed to plead the first element of her state-created danger claim.

VI

Although it is unnecessary to the court's holding, the first amended complaint also fails to allege facts that establish the second element of her state-created danger claim, i.e., that DISD acted with deliberate indifference to Moore's constitutional rights.

A

In *Leffall* a high school student's mother brought a state-created danger claim against DISD after her son was shot and killed as he was leaving a school-sponsored dance held on school premises. *Leffall*, 28 F.3d at 522. The plaintiff alleged that DISD knew that students often carried handguns on school property and knew that, at this particular school, students often fired these handguns after school functions. *Id.* at 523. The frequency of gunfire during and after school functions at the victim's school was so well known that the city police had previously asked school officials to refrain from sponsoring school functions, such as dances, until adequate security could be provided. *Id.* The plaintiff alleged that DISD's minimal response to the danger faced by students of being shot at school functions——DISD provided only two unarmed security guards at this particular dance——demonstrated DISD's callous indifference to the boy's well-being. *Id.* The

Fifth Circuit affirmed a Rule 12(b)(6) dismissal of the plaintiff's state-created danger claim, concluding that the facts alleged were insufficient to establish that DISD had acted with deliberate indifference toward the plaintiff. *Id.* at 530-32. The panel held that "it is not enough to show that the state increased the danger of harm from third persons; the § 1983 plaintiff must also show that the state acted with the requisite culpability in failing to protect the plaintiff from that danger to make out a constitutional violation." *Id.* at 531.

> Assuming arguendo that the decision of the DISD . . . to sponsor the dance at Lincoln High School despite their awareness of the dangers posed thereby was negligent, perhaps even grossly so, we conclude that the conduct of the state actors did not rise to the level of deliberated indifference, which is, after all, a lesser form of intent rather than a heightened degree of negligence. This was not a case in which the state knowingly brought the victim into close proximity with a specific individual known to be likely to commit violence . . . or abandoned the victim in a highly dangerous environment . . . or conspired with the private actor who inflicted the deprivation . . . . Nor did the defendants decide to sponsor the dance with an utter lack of regard for the safety of the attendees. Leffall admits in her complaint that the school officials provided two security guards, albeit unarmed guards, on the night in question, which refutes any contention that the school officials deliberately ignored the risk to persons attending the dance. Although the existence of deliberate indifference is often a "fact-laden question, . . . we conclude that Leffall's complaint affirmatively discloses that the state actors in the instant case were not deliberately indifferent to [the boy's]

constitutional rights.

*Id.* at 531-32 (citations and internal quotation marks omitted). The court concluded its analysis by emphasizing that "'there is a significant distinction between a tort and a *constitutional* wrong.'" *Id.* at 532 (quoting *de Jesus Benavides*, 883 F.2d at 388).

In *Johnson*, in addition to concluding that the plaintiff had failed to state a state-created danger claim because DISD did not create the risk of harm, the panel also held that the facts alleged in the complaint failed to establish the requisite mental culpability of DISD, that is, deliberate indifference:

> Even if the deployment of such security measures was haphazard or negligent, it may not be inferred that the conduct of the defendants rose to the level of deliberate indifference. As in *Leffall*, the most that may be said of the defendants' ultimately ineffective attempts to secure the environment is that they were negligent, but not that they were deliberately indifferent. On the contrary, the facts here pleaded suggest only that [the boy who was shot] was the tragic victim of random criminal conduct rather than of school officials' deliberate, callous decisions to interpose him in the midst of a criminally dangerous environment.

*Id.* at 202 (citations omitted).

B

Viewed through the pleading requirements of *Bell Atlantic*, *Leffall* demonstrates that the fact that Moore employs the phrase "deliberate indifference" throughout her first amended complaint does not mean that she has pleaded facts sufficient to establish

the second element of her claim. *See also Bell Atl.*, 127 S. Ct. at 1964-65 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]") (citations, internal quotation marks, and brackets omitted). Just as in *Leffall*, Moore's complaint alleges conduct by DISD that prevents a finding of deliberate indifference. The first amended complaint states that in response to the growing problem of student violence, "DISD police and security has been increased[.]" 1st Am. Compl. § IX, ¶ 9. Moore also alleges that DISD has enacted a number of policies in an attempt to reduce student violence, such as enacting student codes of conduct and disciplinary and referral procedures and programs. Although Moore alleges that these efforts to reduce student violence have been feckless, and DISD has never enacted a policy specifically targeting the protection of teachers, Moore's "complaint affirmatively discloses that the state actors in the instant case were not deliberately indifferent to [Moore's] constitutional rights." *Leffall*, 28 F.3d at 531-32.

VII

Moore has failed to plead a state-created danger claim. Despite the label of her claim, the facts she alleges charge DISD with providing an unsafe work environment. *See Greene v. Plano Indep. Sch. Dist.*, 103 Fed. Appx. 542, 545 (5th Cir. 2004) (per curiam) (holding that although plaintiff couched her claim for

relief under rubric of state-created danger theory, complaint really stated claim against school district for failure to provide safe workplace).  But "[n]either the text nor the history of the Due Process Clause supports [a] claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Collins*, 503 U.S. at 126.  "The Due Process Clause is not a guarantee against incorrect or ill-advised personnel decisions. Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of harm."  *Id.* at 129 (citations and quotation marks omitted).  As the *Collins* Court concluded, "[w]e also are not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.  Petitioner's claim is analogous to a fairly typical state-law tort claim[.]"  *Id.* at 128.

*　　*　　*

The court grants Moore's November 13, 2007 motion for leave to amend, and it grants DISD's October 19, 2007 motion for partial judgment on the pleadings and dismisses Moore's state-created danger claim in her first amended complaint.

**SO ORDERED.**

March 14, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE